**UNITED STATES of America, Plaintiff,**

**v.**

**Earl E. NELSON and John A. MacLellan, Defendants.**

No. G78–115 CR5.

United States District Court, W. D. Michigan, S. D.

Feb. 15, 1980.

---

James S. Brady, U. S. Atty., Grand Rapids, Mich., for plaintiff.

William Waterman, Pontiac, Mich., Cassius E. Street, Jr., Lansing, Mich., Irving Tukel, Southfield, Mich., for defendants.

## OPINION AND ORDER

HILLMAN, Douglas W. District Judge.

### THE CASE

On July 26, 1978, the grand jury indicted Earl E. Nelson, a Michigan State Senator, with violating the Hobbs Act (18 U.S.C. § 1951) by accepting $5,000.00 from John A. MacLellan, a lawyer, businessman and lobbyist, in exchange for his introducing legislation designed to legalize greyhound dog racing in the State of Michigan. 18 U.S.C. § 1951 reads, in part, as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

\*    \*    \*    \*    \*    \*

(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

MacLellan, in Count II of the indictment, is charged with aiding, abetting, counseling, inducing and procuring Nelson's offense, in violation of 18 U.S.C. § 2(a). That section reads:

"Whoever commits an offense against the United States or aids, abets, counsels, commands, or induces or procures its commission, is punishable as the principal."

Both defendants have filed numerous motions which this court now considers.

## THE FACTS

A former member of the State House of Representatives, Earl E. Nelson was a State Senator for the 24th Senatorial District of the State of Michigan. He was first elected to that position in 1974, and served one term.

John A. MacLellan is named in the indictment as the sole shareholder and President of Michigan Information and Research Services, Incorporated, a company formed and utilized to provide State Legislators and others with current information on pending legislation. MacLellan is further named as one of the "organizers, principals, managers, and administrators, of Michigan Greyhound Racing Enterprises, Inc.", a corporation of the State of Michigan, formed for the purpose of promoting greyhound dog racing and for obtaining the necessary legislation for the legalization of that sport. Michigan Greyhound Racing Enterprises, Inc., was created on March 7, 1977; MacLellan was not, however, one of its incorporators.

The indictment charges that on or about February 24, 1977, in the City of Lansing, Michigan, Nelson obstructed, delayed and affected commerce by unlawfully obtaining $5,000.00 not due to him or his office from John A. MacLellan. This money was said to have been paid in order to obtain Nelson's service as a sponsor for legislation designed to legalize greyhound dog racing in the State of Michigan. The indictment further alleges that greyhound dog racing, if legalized, would depend upon the movement in interstate commerce of "greyhound race dogs, investment monies, participant greyhound dog owners, customers, advertisement, and other materials necessary in the operation of greyhound dog racing tracks." The $5,000.00 payment was said to have been borrowed by MacLellan from the Bank of Lansing, and applied to two installment loan accounts in the name of the defendant, Earl E. Nelson, with a balance having been applied to Nelson's personal checking account. MacLellan's consent to this arrangement was allegedly induced under "color of official right".

On May 11, 1977, Michigan Senate Bill 549, sponsored by Nelson and seven other Michigan Senators, was introduced into the State Senate and assigned to the Senate State Affairs Committee. The bill was subsequently transferred, however, to the Appropriations Committee, where it was assigned to the Special Subcommittee on Parimutuel Greyhound Legislation chaired by Senator Nelson. Although the State Governor firmly opposed SB 549, the bill received wide backing from across the state, including the support of the state AFL–CIO, the Michigan Association of Counties, the Greater Detroit-Building Trade Council, the Wayne County Board of Commissioners, the City of Detroit Common Council, and the American Federation of State, County and Municipal Employees. Nevertheless, on October 25, 1977, with only three of the original eight sponsors voting for passage, the Nelson bill was defeated by the full Senate on a vote of 29 to 5.

Shortly before Senator Nelson announced that he was going to be a candidate for re-election in 1978, the media released to the public stories about the loan and the fact that Senator Nelson had been one of the co-sponsors of dog racing legislation in 1977. Based upon this release of information to the public, the United States Attorney for the Western District of Michigan commenced a grand jury investigation into

the transaction. As part of the investigation, bank officials and bank records of defendants' bank were among persons and papers that were subpoenaed.

Nelson was invited to appear before the grand jury, but declined. MacLellan, on the other hand, was offered broad and transactional immunity for his testimony against Nelson. He rejected this offer, and was subsequently subpoenaed. The grand jury likewise subpoenaed Attorney Richard A. MacLellan, nephew of John MacLellan, and questioned him about his knowledge of the loan transaction. He acknowledged that he had, at various times, acted as an attorney for Michigan Greyhound Racing Enterprises, Incorporated. While Richard MacLellan answered no questions pertaining to his client, John A. MacLellan, according to the defendants, he was compelled to answer questions concerning Michigan Greyhound Racing Enterprises, Incorporated.

The grand jury received no testimony from any of Nelson's seven co-sponsors to SB 549. Nor was it informed that between 1962 and 1965, nine bills identical to Nelson's bill were introduced into the Michigan Senate and were defeated.

Moreover, in the years 1972 and 1973, greyhound dog racing bills were likewise referred to the Appropriations Committee, although Nelson was not a member of the Senate at that time. Furthermore, between 1962 and 1977, 20 bills identical to or similar to Senate Bill 549 were introduced into the Michigan House of Representatives. The vast majority of these bills similarly had numerous sponsors. Finally, by 1977, when Nelson introduced SB 549, which was designed to legalize greyhound dog racing in the State of Michigan, twelve other states had already legalized this sport.[1] Again, the grand jury received none of this information. Nevertheless, on July 26, 1978, the grand jury indicted Nelson for "extortion" in violation of 18 U.S.C. § 1951. MacLellan was charged in Count II of the indictment with aiding and abetting

Nelson's alleged offense, in violation of 18 U.S.C. § 2(a). A copy of the indictment is included as an appendix to this opinion.

## DISCUSSION

### I.

*MOTION TO DISMISS*

The indictment in this case charges that Nelson's unlawful acceptance of $5,000.00 affected interstate commerce. According to the indictment, as a result of Nelson's acceptance of this money, he introduced Senate Bill 549 which, if passed, would legalize a sport dependent upon interstate commerce for the movement of greyhound racing dogs, investment monies, participant greyhound dog owners, customers, advertisements, and other materials necessary in the operation of greyhound dog racing tracks. The defendants assert that the indictment insufficiently alleges jurisdiction, however, and they seek dismissal of it on that ground.

The jurisdictional element of the Hobbs Act is set out in 18 U.S.C. § 1951(a) and (b)(3). That section reads in part:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by . . . extortion . . . (commits an offense under this section)."

Congress defined the term "commerce" in Section (b)(3) by stating:

"The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

New Hampshire, Oregon, South Dakota, Vermont and West Virginia.

---

1. Those states are: Alaska, Arizona, Arkansas, Colorado, Connecticut, Florida, Massachusetts,

This provision then sets out two essential elements of a Hobbs Act crime: extortion, and interference with interstate commerce. Moreover, as the United States Supreme Court, in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1959), stated with respect to this jurisdictional question:

> "Both elements have to be charged . . The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." 361 U.S. at 218, 80 S.Ct. at 274.

Because SB 549, introduced by Nelson pursuant to the alleged $5,000.00 bribe, died on the floor of the State Senate in 1977, the defendants argue that interstate commerce was never, in fact, affected. They recognize, however, that a "potential" effect on interstate commerce is enough jurisdictional basis for a Hobbs Act conviction. The defendants nevertheless claim that where the effect on interstate commerce is "potential" rather than "actual" something more is needed. That is, no conviction under the Hobbs Act can be sustained unless there is a realistic probability, at the time of the offense, that in the future the extortion would have affected interstate commerce. They allege that this "realistic probability" is missing in the instant case.

In support of their claim, the defendants have offered numerous exhibits and affidavits which assert that the bill offered by Nelson not only failed to pass the Michigan Senate, but that its demise was eminently foreseeable. Defendants request this court to take judicial notice of the labyrinthian road bills offered into the state legislature must take in order to be enacted into law, and also the fact that only a significant minority of such bills are passed. Defendants also point to the fact that all previous dog racing bills had, in fact, been defeated. Finally, they seek to support their contention that the Nelson bill would, in like turn, have had the same fate by including affida-

vits of three Michigan legislators who aver that the dog racing bill had absolutely no chance of success and that even if it had passed, the Governor's veto would have followed.

The Government, in its reply brief, responds by arguing that only a de minimis effect on commerce need be proven, and that this is established in this case. It relies heavily on *United States v. Staszcuk*, 517 F.2d 53 (7th Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975), where the court noted that Congress sought to acquire as much jurisdiction under the Hobbs Act as was constitutionally permissible, and further that Congress was as much concerned about the threat of extortion as it was with extortion itself. Because a potential impact upon interstate commerce is said to be enough jurisdictional basis for a Hobbs Act conviction, the Government maintains that the indictment here is sufficient.

In analyzing the defendants' motion, this court is cognizant of the fact that the Hobbs Act was enacted to cope with the problems of racketeering (the "levy of blackmail upon industry")[2] and was intended to eliminate interference with the flow of interstate commerce. In *Stirone v. United States, supra*, the Supreme Court ruled that in enacting the Hobbs Act, Congress intended to use all of its constitutional power to punish those extortions which resulted in any interference with interstate commerce. Lower courts, therefore, have ruled that a showing of minimal or de minimis effect on commerce will satisfy the requirements of the Act.

In *Hulahan v. United States*, 214 F.2d 441 (8th Cir.), *cert. denied* 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954), for example, a union official extorted money from industries involved in interstate commerce by threatening labor unrest. Because the extortion money was paid, however, the union never went on strike and the industries' operations continued without interruption. The court nevertheless found that this situation

---

**2.** *United States v. Local 807*, 118 F.2d 684, 688 (2nd Cir. 1941), *reversed*, 315 U.S. 521, 62 S.Ct. 642, 56 L.Ed. 1004 (1942).

was precisely what Congress sought to prevent in enacting the Hobbs Act, and therefore concluded that the jurisdictional element was met even though commerce was never itself affected. This same conclusion was reached in *United States v. Pranno*, 385 F.2d 387 (7th Cir. 1967), *cert. denied* 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968), where, under similar facts, the court noted that commerce would have been effected had the threat been carried out. As Judge Fairchild, speaking for the unanimous panel in that case, noted at page 389:

> "The Supreme Court has made it clear that the statute is to be construed broadly and is not limited to conduct which directly and immediately obstructs a particular movement of goods in interstate commerce. Extortion by threat to disrupt a local activity the stoppage of which would in turn result in stoppage of interstate shipment of raw materials essential for that activity falls within the act. The statute seems to be read as not only prohibiting the obstruction of commerce by extortion, but also prohibiting extortion by any threat, the carrying out of which would obstruct commerce. We have no doubt of its coverage here." (Footnote omitted).

Similarly, in *United States v. Augello*, 451 F.2d 1167 (2nd Cir.), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1971), the defendant repeatedly extorted "protection" money from a drive-in hamburger restaurant. The Court of Appeals declared that even without a demonstrable effect on interstate commerce, the Hobbs Act applied because the extortion payment resulted in a depletion of resources which would ultimately limit future purchases from interstate commerce. This "depletion of assets" theory has been frequently utilized by other circuits. *See, for example, United States v. DeMet*, 486 F.2d 816 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), and *United States v. Phillips*, 577 F.2d 495 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978), where the court noted at page 501 that "the effect (on commerce) need be only probable or potential, not actual."

In each case, however, in order to establish federal jurisdiction some connection has been required between the extortionate conduct and interstate commerce. *United States v. Elders*, 569 F.2d 1020 (7th Cir. 1978). There, the Seventh Circuit ruled that while that connection need only be de minimis, it must nevertheless exist.

In determining the kind of connection or nexus that will support a Hobbs Act conviction, it has been said that all that needs to be shown is the commission of an extortionate act, the "natural effect" of which would be to delay or affect the movement of goods in commerce. See *United States v. Daley*, 564 F.2d 645 (2nd Cir.), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1977), where Judge Mulligan remarked at page 649:

> "'(I)t is enough that the extortion in any way or degree (citation omitted) affects (interstate) commerce, though its effect may be merely potential or subtle.' *United States v. Augello* (supra). Furthermore, it is not necessary that the purpose of the extortion be to affect interstate commerce. It is sufficient that one of the *natural effects* of the offense is an obstruction of that commerce. (Citations omitted)." (Emphasis added).

The Seventh Circuit has rephrased this "natural effect" test so that a sufficient connection exists if, at the time of the extortionate act, there was a "realistic probability" that an effect on commerce would result. *United States v. Staszcuk, supra*, at 60. In that case, the defendant was a city alderman and was paid by a local veterinarian not to oppose, before the city zoning commission, the veterinarian's proposed zoning variance. The variance was designed to permit the veterinarian to build an animal hospital, and he believed that without his alderman's support, the commission would deny his request. After the variance passed, however, the veterinarian changed his mind. Instead, he developed his property in ways which would have been permissible even without the zoning vari-

ance. Nevertheless, the alderman was indicted for a violation of the Hobbs Act on the claim that interstate commerce was alleged to have been effected because the erection of the hospital, had it been built, would have required the import of out-of-state materials. *Staszcuk, supra*, at 56.

The defendant in *Staszcuk* argued that the court lacked jurisdiction because there was, in fact, no effect on interstate commerce. The district court held, in an unpublished opinion, that the Hobbs Act jurisdiction was satisfied. A three-judge panel of the Court of Appeals, however, reversed. *United States v. Staszcuk*, 502 F.2d 875 (7th Cir. 1974) (*Staszcuk I*). Distinguishing cases finding a de minimis effect sufficient for federal jurisdiction the court concluded at page 879 that:

> "The government cites several cases for the proposition that any *potential* effect on commerce satisfies the Hobbs Act. . . . But here the result of the extortion payment was exactly the same as if no extortion or rezoning had occurred: no shipment of material in interstate commerce. . . .
>
> We agree that the effect of the extortion on commerce does not have to be simultaneous with the extortion. . . But when the effect never materializes— despite the failure or success of the extortion—the commerce element of the Hobbs Act is not established." (Footnote omitted).

A petition for rehearing en banc was granted, and the court, with three dissents, reversed the panel. *United States v. Staszcuk*, 517 F.2d 53 (1975) (*Staszcuk II*). After extensively noting the Hobbs Act's expansive interpretation, as expressed in *Stirone v. United States, supra*, and its commendable goal of barrier free trade. The court stated at page 59:

> "Against this background, we have no alternative but to conclude that Congress intended the Hobbs Act to apply to a case such as this and that it had ample power to effectuate that intent . . .
>
> We are also persuaded that the cases which uniformly hold that a threatened

effect on interstate commerce is sufficient to bring the statute into play notwithstanding the absence of any actual effect, correctly interpret the congressional purpose. Finally, we have no doubt that the extortion revealed by this record is a species of the 'blackmail upon industry' which Congress mustered its full power to eradicate. The muscle of the faithless public servant is just as intolerable as the muscle of the Camorras described by Judge Hand.

> This does not mean, however, that we may ignore the constitutional limits on the power of the national government. Nor may we disregard the statutory language which requires the prosecutor to prove some connection with interstate commerce in every case. We hold, however, that [this] commerce element of a Hobbs Act violation—the federal jurisdictional fact—may be satisfied even if the record demonstrates that the extortion had no actual effect on commerce. Congressional concern is justified by the harmful consequences of the class of transactions to which the individual extortion belongs, and jurisdiction in the particular case is satisfied by showing a realistic probability that an extortionate transaction will have some effect on interstate commerce. . . .
>
> [W]e (do not) think federal jurisdiction is defeated by the fortuitous circumstance that, after the crime has been committed, a change of plans occurred and the hospital was never built." 517 F.2d 53, 59–60 (footnotes omitted).

In a footnote on page 60, the court further remarked:

> "Nor would appellant have been any less culpable if for some unanticipated reason the ordinance had not, in fact, passed on January 27, 1971. Conversely, if on December 8, 1970, no effect on interstate commerce had been foreseeable, a subsequent decision creating an interstate nexus would not retroactively convert a possible state offense into a federal crime."

The Sixth Circuit expressly approved of *Staszcuk* in the case *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). In that case, the office manager of the Tennessee Real Estate Commission was indicted under the Hobbs Act for stealing copies of the state real estate examination and selling those copies to an individual who had already failed to pass that test on three separate occasions. The purchaser of those copies, however, notified the authorities before involving herself in the transaction. As a result, she did not later use the stolen copies to retake the exam. She never became a real estate broker. Interstate commerce was never affected.

The defendant, after pleading guilty to a Hobbs Act violation, argued on appeal that federal jurisdiction was never met. A three-judge panel of the Sixth Circuit, without dissent, affirmed. The court noted at page 301:

> "In *United States v. Staszcuk*, the Seventh Circuit held *en banc* that federal jurisdiction under the Hobbs Act was satisfied by showing that at the time of the offense there was a realistic probability that the robbery or extortion would have affected interstate commerce." (Citation omitted.)

Because a real estate broker often transacts with persons from other states, the court ultimately concluded that this was a case whereby reasonable probability of affecting interstate commerce had been established.

■ In the case at hand, the defendants rely on *Staszcuk* and *Harding* to conclude that no realistic probability existed whereby interstate commerce would have been affected and, therefore, that the indictment should be dismissed. In *Staszcuk*, however, the court determined that the jurisdictional issue of a sufficient connection with interstate commerce to be a factual question reserved for the jury under a proper instruction from the court. *Staszcuk, supra*, at 56. Likewise in the present case I am satisfied the jurisdictional issue involves questions of fact which should be decided by a jury on evidence presented at trial, rather than on ex parte affidavits and other exhibits to which there has been no opportunity for cross examination. Despite the fact no actual effect on commerce occurred either before or after the date of the payments, it will be a proper function of the jury to determine the probabilities at the time of the payments whether a potential effect on commerce has or has not been proven by the Government. *Staszcuk, supra*, at p. 60.

Indeed, this court has found no case in which a Hobbs Act indictment was dismissed before trial due to jurisdictional insufficiency in the indictment. This court is, therefore, not prepared to grant dismissal at this time on the grounds that the indictment insufficiently alleges a connection with interstate commerce.

■ Alternatively, however, both defendants similarly claim that the indictment is insufficient because it fails to set forth the facts establishing the necessary effect on commerce. They argue that interference with commerce constitutes not only the jurisdictional aspect of the Hobbs Act, but similarly is an essential element of a Hobbs Act crime which must be factually set forth in the indictment. I find this claim to be without merit.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides:

> "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charge."

The standard set forth by the Supreme Court for testing the sufficiency of an indictment was stated in *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974):

> "(A)n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. It is generally sufficient that an indictment

set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' *United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882)." (Citations omitted)

The indictment here clearly meets the *Hamling* standard. It sets forth the elements of the offense and with considerable detail as to when and how the alleged offense occurred. The relation to interstate commerce is particularly described in Count I of the indictment. The defendants have been given fair notice of the charge which they are called upon to defend, and the indictment serves to protect their rights against double jeopardy in the event of an acquittal or conviction.

Consequently, pursuant to Rule 12(e) of the Federal Rules of Criminal Procedure, the defendants' motion is denied without prejudice to renew at the close of the Government's proofs.

## II.

### MOTION TO QUASH THE INDICTMENT

The defendant, John MacLellan, next seeks dismissal of the indictment by charging that the grand jury was deprived of its responsibility to indict on the basis of probable cause because the United States Attorney did not present to the grand jury all of the available evidence or all of the witnesses favorable to the accused. Specifically, MacLellan complains that the grand jury was not informed of the fact that over the previous 15 years dog racing legislation repeatedly had been introduced into the Michigan State Legislature, that many of these bills were themselves introduced by co-sponsors of the Nelson bill, that most of those bills similarly had numerous co-sponsors, and that uniformly they had been defeated. Moreover, the defendant protests that while the indictment describes how SB 549 was initially assigned to the Senate State Affairs Committee but was later re-leased and transferred to the Appropriations Committee, and from there, assigned to the Senate Appropriations Committee Special Subcommittee on Parimutuel Greyhound Racing Legislation, chaired by Nelson, the grand jury was never informed of the fact that in 1972 and 1973, at a time when Nelson was not yet a member of the State Senate, dog racing bills were likewise referred to the Senate Appropriations Committee as opposed to the Senate State Affairs Committee.

MacLellan does not assert that the grand jury had before it insufficient evidence on which to indict. Nor does he allege that the grand jury was biased against him except insofar that it was not aware of all the facts. MacLellan argues, however, that by withholding exculpatory evidence, the U. S. Attorney usurped the grand jury's power not to indict. Absence of this power, he says, undermines the grand jury's role in preventing unfounded criminal prosecutions.

Courts should and must be constantly vigilant in preventing prosecutorial intimidation. The grand jury itself is expected to act as a protective body against haste and oppression. The Supreme Court expressly discussed this subject in the case *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), where, at page 390, 82 S.Ct. at page 1373, it said:

"Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malicious and personal ill will. Particularly in matters of local political corruption and investigations is it important that freedom of communication be kept open and that the real issues not become obscured to the grand jury."

The Government, however, is not obliged to call all of the available witnesses for the grand jury. *See, United States v.*

*Eucker,* 532 F.2d 249 (2d Cir.) *cert. denied,* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Nor is it obliged to present to the grand jury information favorable to the defendant. *United States v. Ruyle,* 524 F.2d 1133 (6th Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). Furthermore, unnecessary pre-trial dissection by the court of the evidence before the grand jury would frequently result in costly and inadvisable delay, especially in a case such as this where one of the defendants was himself a witness before the grand jury and had at that time an opportunity to present to the grand jury any exculpatory evidence.

In this regard, Mr. Justice Black, in *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), wrote, at page 363, 76 S.Ct. at page 409:

"If indictments were to be held open to challenge on the grounds that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits. The Fifth Amendment requires nothing more."

█ In light of this, and absent a showing of greater, fundamental prejudice, the defendant has failed to establish a violation of his due process rights. Accordingly his motion to quash the indictment is denied.

### III.

### MOTION TO STRIKE AND SUPPRESS EVIDENCE

### MOTION TO SEAL EVIDENCE

█ A federal legislator who is criminally prosecuted is protected in part by a constitutional privilege under Article I, Section 6 of the United States Constitution, which provides that: ". . . and for any Speech or Debate in either House, they shall not be questioned in any other Place." Moreover, this "speech or debate privilege" is applicable in both civil and criminal proceedings. See, for examples, *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (civil); *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) (criminal).

The Supreme Court has also held that the speech or debate privilege gives a legislator both a substantive immunity from criminal prosecution, and an evidentiary privilege. *See, United States v. Johnson, supra* (immunity); *United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) (evidentiary privilege). Moreover, although the function of the privilege is to protect from judicial inquiry those acts of a legislator which have to do with his or her functioning as the elected representative of the people, the Supreme Court, in *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), determined that the parameters of this speech or debate privilege included only those acts which are:

"an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House."

Likewise, forty-three of the fifty states have included within their constitutions a similar protection for their state legislators. Relevant to the instant case is Article IV, Section 11 of the Constitution of the State of Michigan of 1963, which reads:

"Sec. 11. Senators and representatives shall be privileged from civil arrest and civil process during sessions of the legislature and for five days next before the commencement and after the termination

thereof. They shall not be questioned in any other place for any speech in either house."

In Michigan, therefore, within the context of criminal or civil prosecutions in state courts, state legislators are afforded a speech or debate privilege similar to that provided to United States legislators in Article I of the United States Constitution.

In the present motion, the defendant, Earl Nelson, moves the court to suppress all evidence relating to his legislative activity as a state senator. He recognizes, as did the First Circuit in *United States v. DiCarlo*, 565 F.2d 802 (1st Cir. 1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978), that the speech or debate privilege provided in the United States Constitution applies only to members of the United States Congress and not to state legislators. Similarly, he acknowledges that the speech or debate privilege for state legislators provided in Article IV, Section 11, of the Michigan Constitution is relevant only where state law applies, and grants no protection to state legislators who are being prosecuted in a federal court for a violation of a federal criminal statute. *See, United States v. Gillock*, 587 F.2d 284 (6th Cir. 1978), *cert. granted*, 441 U.S. 942, 99 S.Ct. 2159, 60 L.Ed.2d 1043 (1979).[3] Nelson argues, however, that a state legislator whose legislative acts are privileged from inquiry in a state criminal prosecution should not lose this privilege simply because the forum for his prosecution is a Federal rather than a State court. Specifically, the defendant bases his motion on two grounds; the first is constitutional, while the second is evidentiary.

The constitutional ground rests upon the Supreme Court's decision in *National League of Cities v. Usery*, 426 U.S. 833, 96

S.Ct. 2465, 49 L.Ed.2d 245 (1976). In that case, the Court determined that Congress lacked the authority to extend coverage of the Fair Labor Standards Act (29 U.S.C. § 201, et seq.) to states and their political subdivisions. The majority determined that the Tenth Amendment, which reserves to the States those powers not delegated to the Federal Government by the U. S. Constitution[4], restrained Congress' authority to regulate commerce under the Commerce Clause[5], where exercise of that authority would impair the States' ability to effectively function in a federal system. Nelson argues that Michigan's speech or debate privilege represents a legitimate state interest in legislative independence and unfettered debate. This, he says, is essential to the state's ability to effectively function in a federal system. The defendant contends that the Hobbs Act is an act of Congress enacted pursuant to the Commerce Clause. For this reason, he argues, the Supreme Court's decision in *Usery* precludes the court from denying him the speech and debate protection he is afforded under the State Constitution. The Tenth Amendment's reservation of powers, he maintains, bars any other result.

Alternatively, the defendant argues that a federal common law privilege for state legislators exists which is recognized by Rule 501 of the Federal Rules of Evidence, and which consequently limits the prosecution's production of evidence in this case. Rule 501 provides in part:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State,

---

3. Argued on December 4, 1979, ―― U.S. ――, 100 S.Ct. 1185, 63 L.Ed.2d 454.

4. The Tenth Amendment to the United States Constitution reads as follows: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

5. The Commerce Clause is found in Article 1, Section 8 of the United States Constitution and reads:

"Section. 8. The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;".

or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The defendant accordingly argues that lessons of reason and experience provide a common law privilege which a state legislator may invoke in a federal prosecution.

■ In an opinion handed down in this case on June 29, 1979, Senior Judge Noel P. Fox, then Chief Judge of the United States District Court for the Western District of Michigan, concluded that a privilege recognized by federal common law did in fact exist to which defendant Nelson could claim protection under Rule 501. Judge Fox determined that Nelson's claim was controlled by the Sixth Circuit's decision in *United States v. Gillock, supra,* where a panel majority ruled that a Tennessee legislator properly exercised Rule 501 to suppress evidence of his legislative acts in similar litigation likewise brought under the Hobbs Act. The Government has moved for a reconsideration of Judge Fox's ruling. Due to a reassignment of this case by Judge Fox, the controversy is now before me and I consider this question anew. A full review of the pleadings and briefs convinces me that Judge Fox was correct in his opinion. Consequently, I conclude that the defendant does have a common law speech or debate privilege recognized by Rule 501.

In his earlier opinion, Judge Fox observed the fact that several circuits, with mixed results, recently approached this question. *United States v. Gillock, supra; United States v. Craig,* 528 F.2d 773 (7th Cir.), cert. denied, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976) (*Craig I*); *United States v. Craig,* 537 F.2d 957 (7th Cir. *en banc* 1976) (*Craig II*), cert. denied, sub nom. *Markert v. United States,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 609 (1976); *United States v. DiCarlo, supra; In re Grand Jury Proceedings,* 563 F.2d 577 (3rd Cir. 1977). The Seventh Circuit, *en banc,* and a panel of the First Circuit, have concluded that under Fed.R.Evid. 501, no speech or debate privilege recognized by common law applies in favor of state legislators who are before federal courts pursuant to criminal indictments. Panels of the Third and Sixth Circuits, however, have disagreed; the issue is consequently presently awaiting resolution by the United States Supreme Court.

In *Craig I,* the first case in which this problem was discussed, a majority panel of the Seventh Circuit concluded that in fact state legislators could rely on Fed.R.Evid. 501 to suppress in federal criminal trials evidence of their legislative acts. The panel determined, however, that by testifying before the grand jury, the defendant in that case had waived his rights, and consequently the trial court's order suppressing the defendant's testimony was reversed.

The Seventh Circuit, *en banc,* disagreed. *Craig II.* In a brief opinion which in essence adopted the concurring opinion of Judge Tone in *Craig I,* the majority concluded that recognition under federal common law of the speech and debate privilege in settings such as these would contradict prior rulings of the United States Supreme Court. The protection afforded state legislators from liability under federal law for acts done in their legislative roles arose not out of the United States Constitution's Speech or Debate Clause, the majority argued, but instead out of the common law doctrine of official immunity. *See, United States v. Craig, supra,* at 782 (*Craig I,* concurring opinion of Judge Tone). Under this reasoning, therefore, in determining whether or not a state legislator may suppress evidence at trial of his prior legislative acts, the court should not look to see whether the speech or debate clause of the United States Constitution would protect a member of the United States Congress indicted on a similar charge. Because the protection afforded state legislators and the protection provided to members of the United States Congress via the speech or debate clause of the United States Constitution are not coextensive, the court argued, one must instead ascertain whether or not official immunity would bar prosecution of a state legislator's legislative acts where those acts violate a federal law.

The Seventh Circuit concluded that in looking at common law official immunity alone, a state legislator could be prosecuted under federal law for activities which a federal legislator would be immune. Official immunity does not prevent, for example, injunctive relief against state legislative activities which violate the United States Constitution. Nor are state legislators immune from criminal liability for their legislative acts. Because they concluded that the doctrine of official immunity does not prevent a criminal prosecution against a state legislator where that legislator's legislative acts themselves violate federal law, the majority held that an evidentiary privilege under Fed.R.Evid. 501 concerning those same criminal acts would be inadvisable and inconsistent:

"Immunity from civil but not criminal liability has been regarded as sufficient to achieve the purpose of the doctrine of official immunity, which is to promote independence and fearless discharge of duty on the part of the protected officials. While the federal speech or debate clause serves the same purpose, it has an additional, more fundamental purpose grounded in the separation of powers in the federal government. As the Court said in Gravel v. United States, supra, 408 U.S. at 616, 617, 92 S.Ct. at 2622, 2623:

'The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch.

\* \* \* \* \* \*

'[T]he central role of the Speech or Debate Clause [is] to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary, United States v. Johnson, 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966) . . .'

There being no problem of separation of powers between the federal executive (represented in this case by the United States Attorney) and a state legislature, the Constitution itself does not create an immunity for state legislators as it does for members of Congress. I see no need for the courts to do so either."

This is essentially the conclusion likewise reached by the First Circuit in United States v. DiCarlo, supra.

The contrary view, adopted by the Sixth Circuit in Gillock, supra, and discussed at length by the Third Circuit in In re Grand Jury Proceedings, supra, relies instead upon public policy and the historical roots of the speech or debate privilege. See, for example, Judge Weis' opinion in In re Grand Jury Proceedings, supra, at p. 583, where he said:

"The state legislators, while they must yield to federal authority in areas where that government is supreme, nevertheless have extremely important functions to perform. Their work could be substantially hindered by exposing members to litigation arising out of the performance of legislative duties. Recognition of this fact led the Supreme Court to grant official immunity for federal civil suits, Tenney v. Brandhove, supra [341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019]. That same concern in common law history supports the existence of a privilege for state legislators in federal criminal proceedings. Principles of federal-state comity—'a proper respect for state functions,' Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 570, 27 L.Ed.2d 669 (1971),—reinforce this conclusion."

Moreover, these courts disagree that the existence of such a common law speech or debate privilege is dependent upon the doctrine of official immunity. In a footnote to his opinion in Craig I, for example, Judge Cummings remarked at p. 779:

"The privilege rests on the constitutional judgment that the courts are not deemed the proper place to hold legislators accountable for their acts as elected representatives. Tenney v. Brandhove, supra, 341 U.S. [367] at 371, 71 S.Ct. 783 [at 785, 95 L.Ed. 1019]."

Elsewhere, Judge Cummings, additionally responded, at p. 778, to the argument that a speech or debate privilege ought to arise

only where co-equal branches of government are concerned:

"The Government contends however that the privilege should apply only to questioning of legislators by co-equal branches of government. The policy served by the privilege, the Government argues, is separation of powers; because the national government is supreme, the privilege is inapplicable in this case.

This argument ignores the federal nature of the American system of government. The Constitution confers upon the national government only limited powers. Those powers not granted remain within the domain of the separate states. The reservation of power for the states is not only the import of the Tenth Amendment but also a basic understanding of the draftsmen of the Constitution. 'The proposed Constitution, so far from implying an abolition of the State governments * * * leaves in their possession certain exclusive and very important portions of sovereign power. This fully corresponds, in every rational import of the terms, with the idea of a federal government.' The Federalist, No. 9 at 76 (New American Library Ed. 1961).

\*     \*     \*     \*     \*     \*

Although the speech or debate privilege embraces notions of the separation of powers among co-equal branches of government, its primary message is that legislatures must be able to discharge their lawful responsibility in an atmosphere free from the threat of interference by other governmental units. A legislator in considering whether to support or oppose a proposed law must be free to reflect on the merits; he must not be deterred from advocating a position by the threat of prosecution by a hostile executive. The evil is the fact of deterrence; whether the threat emanates from the local or national executive makes no difference."

Having considered the issue at length, I am convinced that in the instant case reason and experience dictate a finding of a common law speech or debate privilege recognized by Fed.R.Evid. 501. The desire to enhance unrestrained legislative debate compelled our founding fathers to include a speech or debate privilege in Article I, Section 6 of the United States Constitution. Prompted by the bitter and protracted struggle between the Crown and Parliament, which disrupted England for many years [6], the Constitution's authors sought to prevent both "intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Gravel v. United States, supra*, 408 U.S. at 617, 92 S.Ct. at 2623. They consequently included in the Constitution a clause "designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation . . .". *Id.* at 616, 92 S.Ct. at 2622. Moreover, similar clauses have been included in both the Articles of Confederation and the English Bill of Rights of 1689, *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), as well as in the great majority of the fifty states. In view of the purposes of the speech or debate privilege, its common law history, and the important role of the states in governing this country, I conclude that the privilege is simply too important to be denied in a federal criminal prosecution.

Indeed, I fully agree with the opinion of Chief Judge Edwards where, at p. 290 of the Sixth Circuit case, *United States v. Gillock*, he said:

"While we respect the views of the judges in the Seventh and First Circuits who have rejected the existence of common law speech and debate privilege, we feel, as did the Seventh Circuit dissenters and the Third Circuit majority, that the long history and the felt need for protection of legislative speech or debate and the repeated and long recognition of that history in the cases we have cited from the Supreme Court, fully justify our af-

6. *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

firming Chief Judge Brown in his protection of the privilege in this case."

As Judge Fox previously observed, *Gillock* is binding precedent upon this court. Because I am in agreement with Judge Fox's opinion, and for the reasons stated above, the prosecution's motion for reconsideration is denied. Moreover, because I find that Nelson may properly move to suppress evidence of his prior legislative acts because of a speech or debate privilege recognized by Fed.R.Evid. 501, I will not rule on his claim of constitutional protection.

■ In holding that the defendant, Earl Nelson, was protected by a speech or debate privilege via Fed.R.Evid. 501, Judge Fox earlier ordered the United States Attorney to file either a bill of particulars or an offer of proof. In complying with Judge Fox's order, however, the Government has coincidingly asked that the offer of proof it previously presented to this court be sealed and view *in camera*. By granting the Government's motion, however, the court would be precluding the defendants from participating in decisions fundamental to this case, i. e., which of the government's evidence is suppressible under *Gillock*. This result would unfairly and inadvisably prejudice the defense. It is a difficult and uncertain task to determine which "legislative activity" is protected by the speech or debate privilege recognized by Fed.R.Evid. 501. Undoubtedly, the parties have much to contribute which would substantially assist the court. Neither party should be denied that opportunity.

Further, the government has made an insubstantial showing of need to warrant a protective order under Rule 16(d)(1) of the Federal Rules of Criminal Procedure. It is argued that its interests in public security and the privacy of its files outweighs what interest the defendants have in preparing their defense. There is no indication here, however, that public security has been threatened. Nor does it appear that disclosure would unfairly prejudice the government's case.

The burden of justifying a protective order under Rule 16(d)(1), of course, is on the party requesting such an order. *United States v. Leighton*, 265 F.Supp. 27 (S.D.N.Y.1967), *aff'd*, 386 F.2d 822, *cert. denied*, 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968). As the Fifth Circuit said in the case *United States v. Hughes*, 413 F.2d 1244 (5th Cir. 1969), *vacated on other grounds*, 397 U.S. 93, 90 S.Ct. 817, 25 L.Ed.2d 77 (1970), the norm is to deny a request for restricted discovery. In this case, the government's bald statements fall far short of the requisite showing of need.

Moreover, in *Gillock, supra*, the Court of Appeals previously vacated the district court's original suppression order and remanded the case for particularization of the evidence. In its remand order, the court ordered that the government file a formal bill of particulars or offer proof setting forth specific categories of evidence or testimony to be tendered at trial. See, *United States v. Gillock, supra*, at 299. I find, therefore, that the procedures set out by Judge Fox in his earlier order are reasonable and have the Sixth Circuit's approval. For this reason, and those noted above, the government is directed to provide opposing counsel with either a bill of particulars or a copy of its previously filed offer of proof, or in the alternative, to make an offer of proof in open court.

## IV.

*MOTION TO STRIKE, FOR BILL OF PARTICULARS TO SUPPRESS EVIDENCE AND TO DISMISS THE INDICTMENT*

The defendants have also charged that the indictment is fatally defective for each of the following reasons:

(a) It is "fruit of the poisonous tree" which, by relying upon evidence obtained in violation of the defendants' right of privacy, acts as a continuing violation of the defendants' constitutionally protected right to be free from unreasonable searches and seizures;

(b) It fails to allege the essential elements of a Hobbs Act offense by not setting forth:

(1) the illicit compact or agreement,

(2) the state of mind of the victim,

(3) what was "wrongful" about the transaction,

(4) the parties' unlawful intent, and

(5) what constituted the "inducement . . . under color of official right; and

(c) It impermissibly charges MacLellan, a "victim" of Nelson's extortion, as an aider and abettor.

Alternatively, the defendants request the court to strike from the indictment all references to the "defects" listed above, to suppress at trial any related evidence, and to compel the prosecutor to file a bill of particulars alleging the specific "wrongful compact", "inducement", wrongful intent, and state of mind of the parties in question.

The court will now consider these requests in order.

A. Defendants Nelson and MacLellan have moved this court to dismiss the indictment because it is based solely upon illegally obtained evidence in violation of their right to be free from illegal searches and seizures. Alternatively, the defendants request that certain portions of the indictment be stricken, and certain evidence suppressed at trial, because defendants' right to privacy and confidentiality in their business transactions was violated. Defendants' motion is without merit, and I accordingly deny it.

Shortly after Messrs. Nelson and MacLellan finalized what they allege was a "loan transaction", both were contacted by media representatives who sought further information about the arrangement. The transaction itself was not publicized until the next year, however, when Senator Nelson announced his intention to seek re-election. Based upon this release of information to the public, the United States Attorney from the Western District of Michigan commenced a grand jury investigation into the transaction. As part of this investigation, bank officials and bank records were subpoenaed. Relying on these records and upon other information uncovered by the grand jury, the indictment was subsequently issued.

The defendants point out that under Michigan law the records and transactions between bank customers and their banks are privileged, private and confidential in nature. For example, M.S.A. § 23.540(231) [M.C.L.A. § 489.631] [7], which applies to the confidentiality of accounts and loans of savings and loan associations, reads in part:

"The accounts and loans of members shall be kept confidential by the association, its directors, officers and employees and by the supervisory authority, his examiners and representatives and the employees of any federal or state instrumentality or agency. No member or any other person shall have access to the books and records or possess a partial or complete list of the members, except upon express action and authority of the board of directors."

7. M.S.A. § 23.540(231) [M.C.L.A. § 489.631] (Savings and Loan Associations) reads as follows:

§ 23.540(231) Inspection of books and records; confidentiality of accounts and loans; restrictions on access to information.] Sec. 231. Every member shall have the right to inspect such books and records of an association as pertain to his loan or savings account. Otherwise, the right of inspection and examination of the books and records is limited to the supervisory authority or his duly authorized representatives as provided in this act; to persons duly authorized to act for the association; to any federal or state instrumentality or agency authorized to inspect or examine the books and records of an association; and to persons duly authorized to enter and inspect and examine specified books and records by a valid order of a court of competent jurisdiction. The accounts and loans of members shall be kept confidential by the association, its directors, officers and employees and by the supervisory authority, his examiners and representatives and the employees of any federal or state instrumentality or agency. No member or any other person shall have access to the books and records or possess a partial or complete list

Another statute, M.S.A. § 23.710(29) [M.C.L.A. § 487.329][8], similarly applies to banking institutions.

The defendants allege that they informed no one of their loan agreement. Moreover, they claim that they never authorized the bank to disclose their financial arrangements to other persons. The defendants argue that this disclosure to the media by an unknown person and without defendants' permission violated their right of privacy. Because the grand jury investigation directly arose from this allegedly unconstitutional breach of privacy, the defendants assert that the grand jury investigation and subsequent indictment act to perpetuate this violation. As "fruit of the poisonous tree", the indictment should therefore be dismissed. Alternatively, the defendants seek to have this court strike all references from the indictment to defendants' private and confidential dealings with their bank, and to suppress at trial all evidence relating thereto.

The issue before the court, therefore, is whether or not the defendants' privacy has been violated in such a way as to warrant granting the remedies the defendants seek. In resolving this issue, the court must first determine whether or not the defendants' loan transaction was a privileged act.

The defendants initially argue that the unauthorized disclosure of their business affairs by what must have been an employee of the Bank of Lansing breached their expectations of privacy as guaranteed under state law. Accordingly, they argue that the grand jury perpetuated this privilege by relying on media information which had been illegally obtained.

Under state law, however, bank employees and records are not exempt from proper legal process. For example, M.S.A. § 23.710(29) [M.C.L.A. § 487.329], which applies to banks and banking institutions, reads in part as follows:

"Sec. 29. The commissioner and all deputies, agents and employees of the bureau shall be bound by oath to keep secret all facts and information obtained in the course of their duties, except insofar as such person is required, pursuant to law, to report upon or take official action or testify in any proceedings regarding the affairs of any institution."

A similar law, M.S.A. § 23.540(231) [M.C.L.A. § 489.631], applies to savings and loan associations. It is therefore clear that the grand jury did not violate any right guaranteed to the defendants under state law.

Moreover, assuming that state law did, in fact, erect some type of bank/customer privilege, it would not assist Nelson and MacLellan in their motion for dismissal. The defendants would have this court conclude that privileges recognized by state law must likewise be recognized by federal courts pursuant to Rule 501 of the Federal Rules of Evidence. Fed.R.Evid. 501, however, reads in part as follows:

"(T)he privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and pro-

of the members, except upon express action and authority of the board of directors.

8. M.S.A. § 23.710(29) [M.C.L.A. § 487.329] (Banking Institutions) reads as follows:

§ 23.710(29) Confidential information; secrecy; disclosure.] Sec. 29. The commissioner and all deputies, agents and employees of the bureau shall be bound by oath to keep secret all facts and information obtained in the course of their duties, except insofar as such person is required, pursuant to law, to report upon or take official action or testify in any proceedings regarding the affairs of any institution. Notwithstanding the forego-

ing with respect to matters as to which official action is required, the commissioner may make such disclosure and to such persons and at such times as is in the public interest within the purposes of this act. The provisions of this section shall not be applicable to or prohibit the furnishing of information or documents to the federal bank regulatory agencies, nor to disclosures, made to interested parties by the commissioner, at his discretion, with respect to applications for the chartering of new banks, applications for new branch offices or applications for the moving of banking offices.

ceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, (privileges) . . . shall be determined in accordance with State law."

Rule 501, therefore, contradicts the defendants' suggestion. Privileges in criminal actions are determined by federal common law and not by state statutes. 10 *Moore's Federal Practice* § 501.06 (1979). In the context of this case, therefore, defendants' reliance upon state law is misplaced.

■■■ The ultimate question instead is whether or not federal common law recognizes a privilege between individuals and their financial institutions. If such a privilege exists, the grand jury may have violated the defendants' privacy rights by subpoenaing records which were private and protected. I hold, however, that the grand jury subpoena did not violate any privilege available to these defendants under Fed.R. Evid. 501.

*Rosenblatt v. Northwest Airlines, Inc.*, 54 F.R.D. 21 (S.D.N.Y.1971), involved a motion by a corporate defendant seeking a protective order denying the plaintiff access to bank documents and information in a case concerning termination of a proposed corporate merger. Judge Cooper, at p. 22, concluded that the motion for a protective order should be denied because no banker/client privilege exists under federal law:

> "There is no banker-client privilege. The scope of the privilege doctrine is narrow indeed. '[T]he mere fact that a communication was made in express confidence, or in the implied confidence of a confidential relationship, does not create a privilege.' VIII Wigmore on Evidence, § 2286, pp. 528–30 (1961); See Rule 501, Revised Draft of Proposed Rules of Evidence of the United States Courts and Magistrates, Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (March, 1971)."

Five years later, the Supreme Court in the case *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), implicitly agreed with Judge Cooper's conclusions, although it did not expressly ap-

prove of the *Rosenblatt* decision. There, a majority concluded that individuals possess no Fourth Amendment interest in their bank records which would limit a grand jury's authority to subpoena. In his opinion, Justice Powell remarked that Congress had contradicted depositors' legitimate expectations of privacy by enacting the Bank Secrecy Act (12 U.S.C. § 1829b(a)(1)), the express purpose of which was to require record keeping for use in possible later criminal regulatory investigations. The court, therefore, concluded at p. 443, 96 S.Ct. at p. 1624 that:

> "The depositor takes a risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." (Citations omitted).

It is, therefore, clear that the defendants cannot complain that the grand jury subpoenas directly violated their right of privacy.

■■■ Moreover, even if this court were to conclude that the grand jury lacked authority to subpoena bank records and officials because of some inherent privilege available to the defendants under either state or federal law, the defendants' motion for dismissal would nevertheless fail. It is true, as the defendants argue, that where evidence is incompetent and where such incompetent evidence is the only evidence before the grand jury relating to one or many key elements of the offense charged, such evidence cannot serve as the basis for a valid indictment. It does not necessarily follow, however, that where a grand jury has received incompetent evidence, its subsequently issued indictment must be dismissed. The four cases cited by the defense in support of this proposition, *Mead Data Central, Inc. v. United States Dept. of Air*

484

*Force*, 566 F.2d 242 (U.S.Ct.App.D.C.1977); *Continental Oil Company v. United States*, 330 F.2d 347 (9th Cir. 1964); *Schwimmer v. United States*, 232 F.2d 855 (8th Cir. 1956); and *United States v. Jacobs*, 322 F.Supp. 1299 (C.D.California 1971), did not involve a motion to dismiss an indictment based upon incompetent evidence. They are not, therefore, relevant to the question at hand.

Instead, in *Costello v. United States, supra*, a unanimous Supreme Court per Justice Black, upheld the validity of an indictment which was based solely on hearsay evidence before the grand jury. The court there explained that an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, was enough to call for a trial of the charge on the merits. The Fifth Amendment requires nothing more. 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397. The defendants, therefore, cannot argue that the indictment here is insufficient solely because it rests upon incompetent evidence.

The defendants finally argue, however, that even if the grand jury did not itself directly violate the defendants' privilege to privacy in their financial transactions, and even if the grand jury relied upon competent evidence in issuing the indictment, the court should nevertheless dismiss the indictment because the grand jury investigation acted as a continuing breach of the defendants' right to be free from unreasonable searches and seizures in that the grand jury investigation arose solely and directly from the illegal disclosure of the defendants' loan agreement. This proposition is wholly without merit and I deny it.

■ The Supreme Court long ago ruled that the Fourth Amendment acts as a limitation only upon governmental intrusions of citizens' protected interests. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Consequently, evidence secured by private, illegal searches need not be excluded from criminal trials.

"The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authorities, and it was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

In the present case the record clearly shows that no official of the federal government had anything to do with the wrongful seizure of the petitioner's property or any knowledge thereof until several months after the property had been taken from him . . . It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another." 256 U.S. at 475, 41 S.Ct. at 576.

■ Admittedly, the *Burdeau* decision has been judicially limited where equity has required. (See, for example, *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966), where the government instigated the private party's illegal act.) In the context of this case, however, the decision applies without restraint. The government has not illegally breached the defendants' privacy. In fact, the United States Attorney heard nothing of the loan transaction until a year later when the story was first reported in the newspapers. The defendants, therefore, cannot assert that the grand jury investigation arose from evidence illegally obtained by the government. Nor can they assert that the grand jury indictment improperly arose out of a non-governmental invasion of defendants' privacy. For this reason, and for those already discussed, the defendants' motion to dismiss is denied. Moreover, because I hold that the grand jury did not violate the defendants' right to privacy in their financial arrangements, and that the grand jury subpoenas were in all respects proper, I consequently deny the

defendants' motion to strike certain matters from the indictment and to suppress certain evidence at trial.

In a supplemental brief, MacLellan also asserts that the grand jury violated his attorney/client privilege by subpoenaing Richard MacLellan, John MacLellan's nephew and an attorney who at one time represented Earl Nelson, John MacLellan and Michigan Greyhound Racing Enterprises, Inc. Although Richard MacLellan properly refused to answer questions put to him by the grand jury relating to his client, John MacLellan, the defendant alleges that Richard MacLellan was required to testify about Michigan Greyhound Racing Enterprises, Inc. John MacLellan now argues that because he is charged in the indictment as the "organizer, principal manager and administrator" of MGRE, Inc., he has standing to seek dismissal of the indictment because of this violation of privilege.

Based upon the lack of evidence before the court at this time, however, a ruling on MacLellan's motion for dismissal is deferred.

B. Nelson and MacLellan next claim that Count 1 of the indictment is defective in that it does not set out: (1) the alleged "illicit compact or agreement" which constituted the offense; (2) the state of mind of the victim of the alleged extortion; (3) what constituted the "wrongful" nature of the obtaining of the $5,000.00 loan; (4) the unlawful intent of the parties charged; and (5) what constituted the "inducement . . under color of official right". Simply stated, the defendants' motion to dismiss asserts that Count 1 of the indictment fails to charge the essential elements of a Hobbs Act crime.

■ As a general rule, of course, an indictment must charge all of the essential elements of the crime in question. This is the standard set out in Rule 7 of the Federal Rules of Criminal Procedure: "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Moreover, failure to set forth the essential elements of a crime warrants

dismissal of the indictment. *See, Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), where the Supreme Court reversed the convictions of six persons who were convicted of violating a law making it a misdemeanor for any person to refuse to answer any pertinent question put to them by a committee of Congress, because the indictment in question insufficiently informed the defendants of the allegations against them.

■ An indictment is sufficient, however, where it apprises the defendant of what he must prepare to meet, and where it adequately assures that the defendant will not be twice tried for the same crime. *See, United States v. Hollinger,* 553 F.2d 535 (7th Cir. 1977); *United States v. Radetsky,* 535 F.2d 556 (10th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). In this respect, the Second Circuit, in *United States v. Tramunti,* 513 F.2d 1087 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), said at p. 1113:

> "An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged, thereby apprising the defendant of what he must be prepared to meet. Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (Citations omitted)

■ Read as a whole, I conclude that Count 1 of the indictment is sufficient. It adequately sets forth the "illicit compact or agreement" and the "wrongful" nature of the transaction by charging that the $5,000.00 payment was not "due" Nelson or his office, and that such payment was intended to influence his conduct.

■ In addition, the defendants' complaint that the indictment is defective because it fails to set forth the "victim's" state of mind is equally meritless. It is undoubtedly true that state of mind of the victim is an essential element of a Hobbs Act crime where the extortion in question

was accomplished via force or fear. (*See, Hulahan v. United States, supra*, where a labor union representative extorted money from industries by threatening labor unrest). In *United States v. Harding, supra*, however, the Sixth Circuit determined that:

> "extortion defined as the wrongful obtaining of property under color of official right need not include the element of force or duress, and could include such activity as is commonly considered to be bribery." 563 F.2d at 305.

Moreover, the court expressly approved of the Third Circuit's determination, in *United States v. Mazzei*, 521 F.2d 639, 644 (3rd Cir. en banc), cert. denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), that: "(a)ny element of coercion that may be required to establish extortion under the Hobbs Act is supplied by the misuse of the defendants' official power." I find, therefore, that the state of mind of the victim is not an element of a Hobbs Act crime involving extortion "under color of right" and for that reason it need not be alleged in the indictment.

The defendants additionally contend that the indictment is insufficient because it only cursorily alleges that MacLellan's bribe payment was in exchange for Nelson's sponsoring of dog racing legislation. This contention is wholly baseless. The indictment unambiguously charges the illicit quid pro quo: Nelson's introducing dog racing legislation in exchange for an illegal payment of $5,000.00. Rule 7 of the Federal Rules of Criminal Procedure requires no more.

Lastly, Nelson and MacLellan contend that the unlawful intent of the parties has not been charged. They do not, however, substantiate this allegation in their brief. In reviewing the indictment, I find their assertion unfounded.

Consequently, deferring momentarily the question of whether the indictment sufficiently states an offense under 18 U.S.C. § 2(a) as to MacLellan, I conclude that Count 1 is sufficient as it now stands, and deny defendants' motion to dismiss for the reasons stated above.

C. The defendants lastly charge that the grand jury improperly indicted MacLellan for aiding and abetting Nelson's alleged violation of the Hobbs Act in that, they contend, it is impossible for the payor of extorted money to be guilty of aiding and abetting a violation of 18 U.S.C. § 1951. The defendants essentially pose three arguments:

1. They maintain that because the textual language of § 1951 focuses only on the extorter himself, by implication, Congress did not intend to make payors of extorted money equally liable as aiders and abettors under 18 U.S.C. § 2(a). Specifically, the defendants insist that where it takes two persons to perform an act prohibited by law, and the Congressional enactment in question provides penalties for only one of the principals, the grand jury cannot then make the other liable by naming him as an aider and abettor;

2. They allege that MacLellan was the "victim" of Nelson's supposed extortion, and as such he cannot be charged under 18 U.S.C. § 2(a); and

3. They argue that under the Supreme Court's decision in *Gebardi v. United States*, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), an aiding and abetting charge is impossible under the facts of this case.

Additionally, Nelson requests that references to MacLellan be stricken from Count 1 of the indictment upon the court's dismissal of Count 2, the charge which applies to MacLellan alone.

Having considered at length the defendants' arguments, I have concluded that a payor of money which has been extorted "under color of official right" in violation of the Hobbs Act, can, in certain cases, be charged under 18 U.S.C. § 2(a) with aiding and abetting that crime. However, because I conclude that the payor of extorted money can be charged with aiding and abetting in only a narrow set of circumstances, I delay ruling on the sufficiency of Count 2 of the indictment until the government prepares a bill of particulars detailing MacLellan's involvement in the extortion scheme.

The Sixth Circuit has already determined that Hobbs Act extortion "under color of official right" can and does include bribery of the type involved in this case. In *United States v. Harding, supra*, Judge Freeman remarked:

> "The common law understanding of extortion, however, and its evolution into contemporary statutes and decisions does not require [a] distinction between extortion and bribery . . . [A] number of states have held that extortion based on [the color of official right] doctrine covers a wide range of activity, including what is commonly understood as bribery and that extortion and bribery are not mutually exclusive . . .
>
> This Court . . . support(s) the interpretation of the other courts which have considered this matter." 563 F.2d at 304–306.

■ Moreover, a public official can be indicted for extortion under the Hobbs Act even though he did not initiate the unlawful transaction but was first approached by a third party. See, for example, *United States v. Staszcuk, supra*, where a veterinarian contacted the defendant, a city alderman, and bribed him in order to obtain his cooperation before the city zoning commission.

Although the defendants do not dispute the fact that extortion under the Hobbs Act can include bribery of the type alleged in the indictment, and although they agree that public officials violate the law in cases where their "extortions" are induced by the payors of the extorted money (bribes), the defendants nevertheless maintain that payors of "extorted" money cannot be charged as aiders and abettors. Simply stated, the defendants deny that § 1951 and § 2(a) were intended by Congress to reach bribers of public officials. With this I cannot agree.

The defendants pose a three-prong attack. They first contend that where it takes two persons to perform an act prohibited by law, and the Congressional enactment in question provides penalties for only one of the principals, the grand jury cannot then make the other person liable by naming him or her as an aider and abettor.

This is a question of legislative intent which has arisen on several other occasions. For example, in *United States v. Falletta*, 523 F.2d 1198 (5th Cir. 1975), the Fifth Circuit concluded that one who furnishes a firearm to a convicted felon, whose possession of that firearm is a violation of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.App. §§ 1201–1203, can himself be held liable for "inducing" that offense. The same conclusion was recently reached by the Eighth Circuit in a case concerning the National Firearms Act, 26 U.S.C. (I.R.C.1954) §§ 5811, 5861. The court in *United States v. Burkhalter*, 583 F.2d 389 (8th Cir. 1978), explained at p. 391:

> "The fact that the statute refers only to the transferor does not mean that there can be no liability for anyone aiding and abetting the transferor. To hold otherwise would make the aiding and abetting statute inapplicable to any substantive offense wherein aiding and abetting language is not specifically mentioned."

Finally, the Second Circuit has likewise approved of aiding and abetting charges against principals whose behaviors were not expressly proscribed by statute. *United States v. Umans*, 368 F.2d 725 (2d Cir. 1966); *United States v. Kenner*, 354 F.2d 780 (2d Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966); *United States v. Cogan*, 266 F.Supp. 374 (S.D.N.Y. 1967); *United States v. Barash*, 266 F.Supp. 126 (S.D.N.Y.1966). In each of these cases, aiding and abetting charges were upheld against the payors of bribes, illegally received by IRS employees in violation of 26 U.S.C. § 7214 and 18 U.S.C. § 201.[9]

---

**9.** 26 U.S.C. § 7214 reads in part:

"(a) *Unlawful acts of revenue officers or agents.—*

Any officer or employee of the United States acting in connection with any revenue law of the United States—

\*   \*   \*   \*   \*   \*

Whether or not a briber can be charged as an aider and abettor under the Hobbs Act, however, is a question of first impression. The defendants contend that the Hobbs Act language itself precludes this result. They argue that Congress sought only to penalize the "faithless public servant"—the betrayor of public trust—and did not intend to make it a crime to pay the extorted money. MacLellan, they say, is a "victim" of the charged "extortion". As such, the aiding and abetting count is inconsistent with Congress' intent. Supporting their position, they maintain that it is irrational and illogical to charge one with aiding and abetting a § 1951 crime. How, they ask, can one aid and abet the extortion of money from one's own self?

In their brief, the defendants rely on five cases. *United States v. Williamson*, 235 F.Supp. 836 (S.D.Texas 1964); *United States v. Farrar*, 38 F.2d 515 (1st Cir. 1930); *Nigro v. United States*, 117 F.2d 624 (8th Cir. 1941); *United States v. Nasser*, 476 F.2d 1111 (7th Cir. 1973); and *United States v. Bowles*, 183 F.Supp. 237 (S.D. Maine 1958). However, as the Eighth Circuit noted in *United States v. Burkhalter, supra* at 390, these cases stand only for the proposition that persons within the class sought to be protected by a criminal statute may not be prosecuted as conspirators or aiders and abettors. Moreover, I find all of these cases distinguishable.

For example, in *United States v. Williamson, supra*, the Texas district court concluded that a shipper could not be charged as an aider and abettor of a carrier's illegal transport in interstate commerce without a required transport permit. In that case, however, a separate code section expressly included violations by shippers who knowingly patronized uncertified carriers. The court, therefore, determined that the government, being unable to make a case against the shipper under established law, sought to circumvent its dilemma by charging a § 2(a) crime. This, the court concluded, contradicted Congress' intent.

In a similar fashion, the defendants argue here that Congress could not have intended to have § 2(a) apply in a Hobbs Act case because of the existence of both the Travel Act (18 U.S.C. § 1952), which *inter alia* makes it a crime to use any facility in interstate commerce with intent to commit bribery in violation of state law,[10] and those code sections proscribing bribery of federal employees (18 U.S.C. §§ 201–208). The Hobbs Act, however, which was enacted in 1946, pre-dates the Travel Act by 15 years.

(9) who demands, or accepts . . . any sum of money or other thing of value for the compromise, adjustment, or settlement of any charge or complaint for any violation or alleged violation of law, . . . (violates this section)."

18 U.S.C. § 201 reads in part:

"(g) Whoever, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him (violates this section) . . . ."

**10. § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises**

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act [21 USCS § 802(b)]), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

Congress could not therefore have considered the Travel Act when it enacted § 1951. Moreover, the code sections proscribing bribery of federal employees would of course apply only in cases where the "extorter" under the Hobbs Act was himself a federal employee. As such, those sections would not apply in a case such as this where the extortor was a state public official and which Congress clearly meant to reach. For these reasons, Congress could not have intended to exclude aiding and abetting charges from Hobbs Act crimes merely because of the existence of these other code sections. The holding in *United States v. Williamson, supra,* therefore, is inapplicable to the case at hand.

Indeed, contrary to the defendants' position, the Texas court in fact stated that under certain circumstances aiding and abetting violations could be charged:

"Concluding; it should be made clear that the foregoing should not be construed as a holding that a shipper, or other person, may not conspire with a carrier to violate (this section); or that a shipper, or other person, may not be guilty as an aider or abettor if, in fact, he 'aids, abets, counsels, commands, induces or procures' the violation. The holding simply is that the knowing shipment of his goods by a shipper and the payment of the proper tariff, does not constitute such shipper an aider or abettor. Such conduct merely makes it possible for the carrier to violate the law." 235 F.Supp. at 838–839.

Furthermore, I believe that MacLellan is mistaken in relying on *United States v. Farrar, supra, Nigro v. United States, supra,* and *United States v. Nasser, supra,* because aiding and abetting charges were not involved in those cases.[11] In *Nasser,* for example, the court concluded that a conspir-

acy charge could not lie against a person who induced a former government employee to violate 18 U.S.C. § 207(a) by having that former employee act as an attorney on a matter with which he was previously involved while employed with the IRS. The Seventh Circuit in fact expressly reserved a judgment on the aiding and abetting question when it said, at p. 1122: "The extent to which the *Gebardi* reasoning would apply to a charge as a principal, under 18 U.S.C. § 2 . . . need not be considered here, (that) charg(e) being absent."

Finally, in *United States v. Bowles, supra,* the last case cited by the defendants, it is true that the district court dismissed an aiding and abetting charge against a payor of a bribe to an ICC employee, the receipt of which was a violation of 18 U.S.C. § 281.[12] The court carefully explained, however, that § 281 originated from an 1864 statute which predated 18 U.S.C. § 2(a) by 45 years, and so Congress could not have relied on § 2(a) in seeking to proscribe aiding and abetting. For this reason, the court concluded at p. 252, because Congress did not include "aiding and abetting" language in the statute itself, "Congress could not, therefore, at that time have intended that the giver of compensation to a government employee should be criminally liable." The district court therefore determined that where a defendant aids and abets a violation of a law enacted prior to 1909, the year in the aiding and abetting provision of the United States Code was enacted, the grand jury cannot properly charge aiding and abetting unless the substantive statute in question expressly permits it.

In the case at hand, however, § 2(a) was enacted 25 years before the Hobbs Act, or its predecessor, the Anti-Racketeering Act

---

11. *Farrar, Nigro* and *Nasser* involved conspiracy charges as opposed to the aiding and abetting charge involved here. While MacLellan contends that the two offenses should be treated in the same way, I do not agree. In a conspiracy, the unlawful act is the illicit agreement itself, and a conspirator can be convicted even if the conspiracy itself is not ultimately successful in achieving its unlawful goal. In an aiding and abetting case, however, the abettor

cannot be convicted unless the principal violator of a law has succeeded in committing a crime.

Because it is easier to convict a person of conspiracy as opposed to aiding and abetting, the two crimes need not be identically treated.

12. 13 Stat. 123, C. 119, *repealed,* Pub.L.87–849, § 2, Oct. 23, 1962, 76 Stat. 1126.

of 1934,[13] were even considered. For this reason, *Bowles,* cannot support the defendants' claim that the Hobbs Act belies an aiding and abetting charge.

The defendants further argue, however, that persons who pay money illegally extorted in violation of the Hobbs Act are "victims" of those extortions and cannot be charged as aiders and abettors. Congress could not have intended to reach the payors of extorted money, they assert, where those payments are "induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

The defendants are correct in maintaining that extortion victims are in a protected class, and that Congress did not intend to criminalize their behavior. The legislative history of the Hobbs Act, as well as its predecessor, the Anti-Racketeering Act of 1934, clearly shows that Congress did not intend to criminalize payments made under threat or fear. *See, United States v. Harding, supra.* As the House Committee on the Judiciary noted, in House Report No. 238 issued February 27, 1945:

> "In the light of the testimony and admissions contained in the hearings and of the above-quoted provisions of the Constitution, there must be agreement that those persons who have been impeding interstate commerce and levying tribute from free-born American citizens engaged in interstate commerce shall not be permitted to continue such practices without a sincere attempt on the part of Congress to do its duty of protecting interstate commerce." 1946 *U.S.Code Congressional Service* 1360, 1370.

■ But the defendant in this case is more than just a payor of extorted money. He is an initiator of an extortion. As such, he is in no position to contend that he is the innocent "victim" of Nelson's alleged extortion. While it is true that payors of extorted money are in a class Congress sought to protect in enacting the Hobbs Act, initiators of those "extortions", even if, in fact, they ultimately become payors, are not within a protected class. The indictment alleges that MacLellan is more than a mere victim, he is a briber. Therein lies the gravamen for the second count of the indictment, and MacLellan is mistaken in concluding that this result is inconsistent with § 1951's language.

Alternatively, MacLellan maintains that the Supreme Court's decision in *Gebardi v. United States, supra,* prohibits the bringing of an aiding and abetting charge under the facts of this case. *Gebardi* arose under the Mann Act (18 U.S.C. §§ 2421–2424), which made it a crime for anyone to knowingly transport, or cause to be transported, or to aid or assist in obtaining transportation for, or in transporting, in interstate commerce, a woman or girl for an immoral purpose. Such "immoral purpose" was held to cover intercourse between two consenting adults who were not yet married. A separate section of the Act made it a crime to "aid or assist" in inducing a female to cross state lines for such a purpose, or in her transportation for such a purpose.

In *Gebardi,* an unmarried couple was indicted for conspiracy to violate the Mann Act because they crossed state lines for the purpose of engaging in sexual intercourse. The evidence established that the woman consented to the venture, and went willingly and voluntarily for the specified "immoral purpose" prohibited by the Act. The question before the Court, therefore, was whether or not a woman could be indicted for conspiring to transport herself across state lines with the intention of violating the Mann Act.

The Supreme Court held that the aiding and abetting section of the statute was not intended to reach women who, by yielding to persuasion, assisted in their own transportation, and that the mere agreement on her part to such transportation and immoral purpose was not such "aid or assistance" as would subject her to the penalty imposed by the Act. In reversing defendant's conviction, Justice Stone reasoned 287 U.S. at pp. 118–123, 53 S.Ct. at pp. 36–38:

**13.** Active June 18, 1934, Ch. 569, 48 Stat. 979.

". . . (T)he statute is drawn to include those cases in which the woman consents to her own transportation. Yet it does not specifically impose any penalty upon her, although it deals in detail with the person by whom she is transported . . .

"(W)e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished."

The defendants contend that *Gebardi* establishes the principle that where Congress proscribes conduct which requires more than one actor for completion, and where the conduct of only one of the principal actors conduct is expressly made unlawful, the other actor cannot thereafter be charged with conspiracy or with aiding and abetting. This principle, it is alleged, affects the Hobbs Act because Congress, in prohibiting bribery, must have likewise understood that for every bribe there is a briber. Therefore, by proscribing only the receipt of "extorted" funds, argue the defendants, Congress did not intend to reach the bribers themselves.

As the Fifth Circuit noted in *United States v. Falletta*, 523 F.2d 1198, 1200 (5th Cir. 1975), "(t)he rule of construction announced in *Gebardi* amounts at best to a weak presumption about legislative intent." Moreover, Justice Stone, who wrote the opinion in *Gebardi*, was careful to distinguish *United States v. Holte*, 236 U.S. 140, 35 S.Ct. 271, 59 L.Ed. 504 (1915), where Justice Holmes concluded that under special circumstances a woman could in fact be indicted for aiding and abetting her own transportation intended to violate the Mann Act. The distinction, noted Justice Stone, lay in the magnitude of the woman's involvement:

"First, Those exceptional circumstances envisaged in *United States v. Holte, supra*, as possible instances in which the woman might violate the act itself, are clearly not present here. There is no evidence that she purchased the railroad tickets or that hers was the active or moving spirit in conceiving or carrying out the transportation. The proof shows no more than that she went willingly upon the journeys for the purposes alleged." 287 U.S. at 117, 53 S.Ct. at 36.

In fact, where the woman's behavior was active and inducive, the Court advised at pages 118–119, 53 S.Ct. at page 36, a conspiracy charge could follow:

"The Act does not punish the woman for transporting herself; it contemplates two persons—one to transport and the woman or girl to be transported. For the woman to fall within the ban of the statute she must, at the least, 'aid or assist' someone else in transporting or in procuring transportation for herself. But such aid and assistance must, as in the case supposed in *United States v. Holte, supra*, [236 U.S. 140] 145, [35 S.Ct. 271, 59 L.Ed. 504] be more active than mere agreement on her part to the transportation and its immoral purpose . . . In applying this criminal statute we cannot infer that the mere acquiescence of the woman transported was intended to be condemned by the general language punishing those who aid and assist the transporter." (Footnotes omitted)

Presuming, therefore, that MacLellan's participation in Nelson's alleged extortion involved more than mere payment of money and presuming further that MacLellan actively solicited and procured Nelson's supposed illegal conduct, then *Gebardi* is not controlling. If MacLellan actively induced and solicited Nelson's "extortion", then conduct "more active than mere agreement" is involved which would make *Gebardi* inapplicable. The ultimate question, therefore, is whether Congress, in enacting the Hobbs Act, intended to reach payors of "extorted" money where those payors had actively prompted that "extortion". Did Congress intend the Hobbs Act to reach bribers via 18 U.S.C. § 2(a)?

Having found the defendants' contentions unpersuasive, other factors convince me that in fact Congress did intend this result. Both the case history and the legislative

history of the Hobbs Act make it abundantly clear that this statute was intended "to prevent anyone from obstructing, delaying, or affecting commerce, or the moment of any article or commodity in commerce by robbery or extortion, as defined in the bill."[14] The Supreme Court reiterated this point when it declared, in *Stirone v. United States*, that:

"(the) Act speaks in broad language, manifesting a purpose to use all the constitutional powers Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference *'in any way or degree'* 18 U.S.C. § 1951(a)." 361 U.S. at 215, 80 S.Ct. at 272 (emphasis added).

Moreover, I cannot believe that Congress, in enacting the Hobbs Act, consciously considered and rejected the prospect of holding liable payors of extorted money. While the brief and undetailed legislative history establishes Congress' intent to use the utmost of its constitutional power in order to prevent interference with interstate commerce, it does not in any way indicate that Congress even considered the problem of aider and abettor liability. As the Fifth Circuit, in *United States v. Falletta, supra,* noted at p. 1200 in a similar case involving the Omnibus Crime Control and Safe Streets Act of 1968: "Under these circumstances, we cannot find, as *Gebardi* did, an 'affirmative legislative policy' to create an exemption from the ordinary rules of accessorial liability."

Although MacLellan contends that this interpretation of the Hobbs Act leads to the grand jury's irrational allegation that he aided and abetted the extortion of money from his own self, I do not share his misgivings. Merely because Congress did not express itself in the most precise and most unambiguous language imaginable does not make its legislation defective. While use of the term "bribery" in place of or in addition to "extortion . . . induced . . . under color of official right" would have simplified the present controversy, this does not render the Hobbs Act uncogent or illogical.

▮▮▮▮ Having concluded that the Hobbs Act will support an aiding and abetting charge under § 2(a), therefore, the court must next determine whether or not this indictment properly charges MacLellan with that crime. I have decided, however, that the indictment is without sufficient detail to make a decision on the merits, and accordingly I defer a ruling on the defendants' motion until the government has presented a bill of particulars.

Paragraph 1 of Count 2 of the indictment adopts and incorporates by reference paragraphs 1 through 7 of Count 1. The only other paragraph in Count 2, paragraph 2, reads as follows:

"That at all times material herein, defendant John A. MacLellan did aid, abet, counsel, induce and procure defendant Earl E. Nelson in his violation of Section 1951, Title 18, United States Code, contrary to Section 2(a), Title 18, United States Code."

MacLellan contends that these allegations are defective in that they fail to state the essential elements of an aiding and abetting crime. Whether or not there is merit to the defendant's argument, however, cannot be determined at this time.

While it is true that in most cases an indictment need do little more than track the language of the statute charged and state the time and place of the alleged crime, (see *United States v. Tramunti, supra,* and the related discussion in Section IV(B) of this opinion), the Supreme Court, in *United States v. Simmons,* 96 U.S. 360, 362, 24 L.Ed. 819 (1887), held that an indictment not framed to apprise a defendant "with reasonable certainty of the nature of the accusation against him . . . is defective, although it may follow the language of the statute."

This same view was reiterated in *Russell v. United States, supra,* 369 U.S. at pp. 763–770, 82 S.Ct. at pp. 1046–1050, where the Supreme Court reversed the convictions

---

14. 1946 *U.S.Code Congressional Service,* pp. 1360, 1369 (emphasis added).

of six persons charged with violating 2 U.S.C. § 192, which made it a misdemeanor for persons to refuse to answer pertinent questions put to them by a committee or subcommittee of Congress. In each case, the indictment returned by the grand jury stated that the questions to which answers were refused "were pertinent to the question then under inquiry" by the subcommittee, but the indictments failed to identify the subject then under inquiry by that subcommittee when the witness was interrogated. The Supreme Court held that these indictments failed to adequately apprise the defendants of what they must be prepared to meet at trial, and insufficiently guaranteed that they would not be twice tried for the same crime. Justice Stewart, writing for the majority, said at pp. 763–770, 82 S.Ct. at pp. 1048–50:

"In a number of cases the Court has emphasized two of the protections which an indictment is intended to guarantee, reflected by two of the criteria by which the sufficiency of an indictment is to be measured. These criteria are, first, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet," ' and, secondly, ' "in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *Cochran and Sayre v. United States,* 157 U.S. 286, 290, 15 S.Ct. 628, 630, 39 L.Ed. 704; *Rosen v. United States,* 161 U.S. 29, 34, 16 S.Ct. 434, 480, 40 L.Ed. 606.' *Hagner v. United States,* 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861. See *Potter v. United States,* 155 U.S. 438, 445, 15 S.Ct. 144, 146, 39 L.Ed. 214; *Bartell v. United States,* 227 U.S. 427, 431, 33 S.Ct. 383, 384, 57 L.Ed. 583; *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314; *United States v. Debrow,* 346 U.S. 374, 377–378, 74 S.Ct. 113, 115–116, 98 L.Ed. 92

. . .

'In an indictment upon a statute, it is not sufficient to set forth the offense in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished; * * * ' *United States v. Carll,* 105 U.S. 611s 612, 26 L.Ed. 1135. 'Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.' *United States v. Hess,* 124 U.S. 483, 487, 8 S.Ct. 571, 573, 31 L.Ed. 516. See also *Pettibone v. United States,* 148 U.S. 197, 202–204, 13 S.Ct. 542, 545, 37 L.Ed. 419; *Blitz v. United States,* 153 U.S. 308, 315, 14 S.Ct. 924, 927, 38 L.Ed. 725; *Keck v. United States,* 172 U.S. 434, 437, 19 S.Ct. 254, 255, 43 L.Ed. 505; *Morissette v. United States,* 342 U.S. 246, 270, n.30, 72 S.Ct. 240, 253, 96 L.Ed. 288. Cf. *United States v. Petrillo,* 332 U.S. 1, 10–11, 67 S.Ct. 1538, 1543, 91 L.Ed. 1877. That these basic principles of fundamental fairness retain their full vitality under modern concepts of pleading, and specifically under Rule 7(c) of the Federal Rules of Criminal Procedure, is illustrated by many recent federal decisions . . .

It has long been recognized that there is an important corollary purpose to be served by the requirement that an indictment set out 'the specific offence, coming under the general description,' with which the defendant is charged. This purpose, as defined in *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588, is 'to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.' . .

Viewed in this context, the rule is designed not alone for the protection of the defendant, but for the benefit of the prosecution as well, by making it possible for courts called upon to pass on the validity of convictions under the statute to bring an enlightened judgment to that

task. Cf. *Watkins v. United States, supra* [354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273].

It is argued that any deficiency in the indictments in these cases could have been cured by bill of particulars. But it is a settled rule that a bill of particulars cannot save an invalid indictment." (Footnotes omitted).

In *Russell*, however, the defendants were never informed even at trial of the subject matter under investigation by the Congressional subcommittee, and so were never offered an opportunity to defend their refusal to answer on the grounds that the questions put before them were not "pertinent". The court was therefore concerned, in part, that the ambiguity of the indictment might empower the prosecutor to prove at trial an essential element of the crime in question, pertinence to a matter before the subcommittee, on evidence never put before the grand jury. For this reason, the court decided that a bill of particulars issued pursuant to Rule 7 of the Federal Rules of Criminal Procedure could not cure the already invalid indictment:

"To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him. See Orfield, Criminal Procedure from Arrest to Appeal, 243." 369 U.S. at 770, 82 S.Ct. at 1050.

In *Stirone v. United States, supra*, the Supreme Court was similarly concerned that a defendant would be convicted at trial on a theory different from that presented to the grand jury. There, the defendant was indicted under the Hobbs Act with extorting money from the owner of a steel plant by threatening labor unrest. The only interstate commerce mentioned in the indictment was the importation into Pennsylvania of sand to be used in building a steel plant there. At trial, however, the trial judge also permitted the introduction of evidence to show interference with the exportation from Pennsylvania of steel to be manufactured in the victim's plant, and he instructed the jury that it could base a conviction upon interference with either the importation of sand or the exportation of steel. The Supreme Court, per Justice Black, considered this to be an impermissible variance:

"The indictment here cannot fairly be read as charging interference with movements of steel from Pennsylvania to other States nor does the Court of Appeals appear to have so read it. The grand jury which found this indictment was satisfied to charge that Stirone's conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel from a mill later to be built with Rider's concrete. And it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned . . . The every purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. Thus the basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge." 361 U.S. at 217, 80 S.Ct. at 273–74.

The failure of the indictment in *Russell v. United States, supra*, to set forth the subject matter under inquiry by the Congressional subcommittee, and the fatal variance in *United States v. Stirone, supra*, which enabled the defendant to be convicted upon a theory of "affecting interstate commerce" which was not even considered by the grand

jury, do not require this court to dismiss outright Count II of the indictment now at hand. In those cases, the Supreme Court reversed the defendants' convictions because the insufficiency of the indictments meant that the defendants might be convicted on grounds different from those on which the grand jury indicted. That is not, however, the problem currently before me. A bill of particulars here would merely specify MacLellan's conduct leading up to the alleged bribe.

If the bill of particulars shows that Mac-Lellan's behavior was so "inducive" and "procuring" that Congress clearly would have intended an aiding and abetting charge to follow, then the indictment will be sufficient as it stands and will adequately inform MacLellan of the charges which he must prepare to meet. If, on the other hand, the bill of particulars shows that Mac-Lellan's alleged bribe payment was made only upon the insistence of Nelson, then the indictment will be insufficient as it applies to MacLellan because Congress clearly did not intend to criminalize a "victim's" compliance with an extortion scheme. The problem here is a factual issue which a bill of particulars will clarify. This is not a case, however, where the insufficiency of the indictment empowers the prosecutor to try the defendant upon a theory different from that on which the grand jury indicted.

■ Moreover, in determining the sufficiency of an indictment, a court may rely on the particularization of a defendant's alleged wrongful behavior supplied by a bill of particulars. For example, in *United States v. Roberts*, 264 F.Supp. 622 (S.D.N.Y. 1966), *aff'd* 408 F.2d 360 (2nd Cir. 1969), the trial court upheld the sufficiency of an indictment charging the defendant with the illegal receipt of gratuities for performance of official duties even though the indictment failed to specify the names of the bribe donors. Similarly in *United States v. Harris*, 523 F.2d 172 (6th Cir. 1975), a unanimous Sixth Circuit panel held that an indictment charging the defendant with aiding and abetting the commission of an armed robbery was not defective even though it

failed to name the principal whose wrongful act the defendant aided and abetted. In both cases, the court in part relied on the fact that the defendants could have obtained more definite information via Rule 7 of the Federal Rules of Criminal Procedure.

In light of this, I conclude that the indictment is not so insufficient that it must be dismissed. Failure of the indictment to adequately inform the defendant of the charges against him and to insure that he will not be twice tried for the same act may be cured by a bill of particulars. Consequently, a resolution of defendant's motion to dismiss is deferred until a later time, and the United States Attorney is instructed to issue a bill of particulars specifically detailing MacLellan's acts which it is claimed aided and abetted Nelson's alleged extortion. In light of the foregoing, Nelson's motion to strike from the indictment references to MacLellan is likewise deferred.

## V.

### MOTION TO DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION

The defendant, Earl Nelson, lastly moves this court to dismiss the indictment due to selective prosecution. He alleges that the prosecutor impermissibly focused his investigatory powers upon him alone while other state legislators, themselves having allegedly taken money in exchange for their vote on pending legislation, went unprosecuted.

■ It is, of course, well established that the Due Process Clause of the Fifth Amendment is violated when federal officials enforce a valid statute in a discriminatory way. *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972); *Washington v. United States*, 130 U.S.App.D.C. 374, 401 F.2d 915 (U.S.App.D.C.1968); *Cf., Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). In addressing this issue, however, the Supreme Court has indicated that selectivity in prosecution alone is not constitutionally violative. Dismissal of an indictment follows only where the government has employed some unjustified, arbitrary

standard such as race or religion. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Two Guys From Harrison—Allentown, Inc. v. McGinley*, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961).

In *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973), the court, *en banc*, reversed the appellant's conviction for failing to possess a draft registration card and remanded for an evidentiary hearing concerning potentially impermissible selective prosecution. The majority stressed that when a defendant alleges selective prosecution and raises a reasonable doubt about the prosecutor's motive, further inquiry is in order:

> "The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice. However, when a defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose, we think a different question is raised." *Id.* at 620–621.

■ As pointed in *United States v. Steele, supra,* the burden of establishing this "sufficient showing" rests on the defendant. A prima facie case is made when the defendant shows that (1) other, similarly-situated persons have themselves not been prosecuted (i. e., that the defendant has been "singled out"); and (2) that the government's selective behavior is invidious and in bad faith (i. e., based upon impermissible considerations such as race, religion or the desire to prevent the defendant from exercising his other constitutional rights). *United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974).

■ Nelson's attempt here to meet this test is insufficient. He alleges that the United States Attorney refused to investigate an illegal payment purportedly made to two other prominent state congressmen after they took and passed polygraph examinations given to them by the state Attorney General. Apparently, the defendant himself was not afforded this option and he now complains that this disparity of treatment is unconscionable. Moreover, he decries the fact that before the grand jury no testimony was given or required of any of the seven other co-sponsors of the Nelson bill, or any of the sponsors of any other dog racing legislation introduced between 1962 and 1975. Furthermore, he alleges that no other sponsor or dog racing legislation between 1962 and 1975 has ever been investigated with regard to his or her financial or political relationships with dog racing advocates.

The defendants allegations of impropriety, however, do not compare with those substantiated in other cases where dismissal has been granted. This is not a case where many other individuals broke the law yet only a select few were prosecuted, *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972); nor is this a case where persons were not prosecuted even though their illegal conduct was obvious and well known, *United States v. Cammisano*, 413 F.Supp. 886 (W.D.Missouri), *vacated on other grounds,* 546 F.2d 238 (8th Cir. 1976); or where there has been an explicit showing of selective prosecution based on impermissible discriminatory standards, *United States v. Falk, supra; United States v. Steele, supra.*

The defendant's minimal allegations fail to make a prima facie showing of unconstitutional selective prosecution. His motion for dismissal is consequently denied.

## VI.

### *MOTION TO STRIKE*

The defendants have also moves to strike surplusage as well as allegedly prejudicial material from the indictment. Because this court must later make related decisions concerning Nelson's speech or debate privilege, this motion is reserved until a later time.

### APPENDIX

NOEL P. FOX, District Judge.

The Grand Jury charges:

## Count 1

1. That at all times material herein, Earl E. Nelson was State Senator for the 24th Senatorial District of Michigan.

2. That at all times herein, John A. MacLellan was a lawyer, businessman and lobbyist. He was the sole shareholder and President of Michigan Information and Research Services, Inc., a company formed and utilized to provide state legislators and others with current information on pending legislation. Furthermore, he was one of the organizers, principals, managers, and administrators of Michigan Greyhound Racing Enterprises, Inc., formed for the purpose of promoting greyhound dog racing in the State of Michigan, and obtaining the necessary legislation to legalize greyhound dog racing in the State of Michigan.

3. That at all times material herein, the Michigan Senate was empowered to pass legislation to legalize greyhound dog racing in the State of Michigan.

4. That at all times material herein, the establishment of greyhound dog racing, if legalized in the State of Michigan, would be dependent upon interstate commerce for the movement of greyhound race dogs, investment monies, participant greyhound dog owners, customers, advertisement, and other materials necessary in the operation of greyhound dog racing tracks.

5. That on or about February 24, 1977, in the City of Lansing, County of Ingham, in the Western District of Michigan,

### EARL E. NELSON,

defendant herein, did obstruct, delay and affect commerce, as that term is defined in Section 1951, Title 18, United States Code, including, but not limited to, the movement of greyhound race dogs, investment monies, participant greyhound dog owners, customers, advertisement, and other material necessary in the operation of greyhound dog racing tracks, by extortion, as the term is defined in Section 1951, Title 18, United States Code, in that Earl E. Nelson did unlawfully obtain the sum of $5,000.00 in cash, or the benefit of said cash, which was not due him or his office, from John A. MacLellan of the aforesaid Michigan Information and Research Service, Inc., and Michigan Greyhound Racing Enterprises, Inc., with consent of John MacLellan, said consent being obtained under color of official right, in that said $5,000.00 was borrowed by John A. MacLellan on or about February 24, 1977, from the Bank of Lansing, Lansing, Michigan, and applied to two installment loan account in the name of Earl E. Nelson, and the balance applied to defendant Earl E. Nelson's personal checking account; that said money was paid by said John A. MacLellan to or on behalf of defendant Earl E. Nelson in order to obtain defendant Nelson's service as a sponsor for greyhound dog racing legislation.

6. That on or about May 11, 1977, Michigan Senate Bill 549, sponsored by defendant Earl E. Nelson was introduced into the Michigan State Senate.

7. That at all times material herein, Senate Bill 549 was initially assigned to the Senate State Affairs Committee but was released or transferred to the Appropriations Committee and there assigned to the Senate Appropriations Committee Special Subcommittee on Parimutuel Greyhound Racing Legislation, chaired by the defendant, Earl E. Nelson.

18 U.S.C. § 1951

## Count 2

1. The grand jury adopts and incorporates by reference the allegations contained in paragraphs one through seven of Count 1.

2. That at all times material herein, defendant John A. MacLellan did aid, abet, counsel, induce and procure defendant Earl E. Nelson in his violation of Section 1951, Title 18, United States Code, contrary to Section 2(a), Title 18, United States Code.

18 U.S.C. § 1951
18 U.S.C. § 2(a)

A TRUE BILL

/s/ Linda C. Johnson
Foreman

/s/ James S. Brady
James S. Brady
United States Attorney